**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re  THE NATIONAL ORGANIZATION  : Chapter 11
      FOR CHILDREN, INC.,  :
       :
            Debtor  : Bky. No.  06-10777ELF
       :

# M E M O R A N D U M

**BY:  ERIC L. FRANK,  U.S.  BANKRUPTCY JUDGE**

## I.  INTRODUCTION

The debtor in this chapter 11 bankruptcy case, the National Organization for Children,

Inc. ("the Debtor"), is a non-profit corporation that formerly operated a cyber (i.e., on-line)

"charter school" pursuant to the Pennsylvania Charter School Law, 24 P.S. §§17-1701-A to 17-

1751-A.  The Debtor ceased operating in 2003 and filed a voluntary petition under chapter 11 of

the Bankruptcy Code on March 2, 2006.  In this case, the Debtor proposes to liquidate its assets.

After the commencement of the case, the U.S. Trustee formed two official committees:

(1) the Official Committee of Unsecured Creditors ("the Committee") and (2) the Parents'

Compensatory  Educational Funds Committee ("the Parents' Committee").  See 11 U.S.C.

§1102(a)(1).

The Committee is a traditional unsecured creditors' committee representing the interests

of persons holding unsecured claims against the bankruptcy estate.  The Parents' Committee

represents the interests of former students and parents of former students of the Debtor charter

school who were entitled to, but did not receive, special education services while attending the

school and who, as a result, hold unsecured claims against the bankruptcy estate ("the Comp-Ed

Claims").[1]

In addition, there is a third, unofficial committee participating in this case, known as the "Special Committee." The Special Committee consists of some former members of the Debtor's board of directors.[2] Earlier in the case, these former directors filed a motion to dismiss this bankruptcy case, asserting that their ouster from the Debtor board was unlawful and therefore, this bankruptcy case was filed without the requisite corporate authority. The Special Committee's status as an unofficial committee was recognized as a result of the court's approval of a settlement of the motion to dismiss.

Presently before me is a joint motion filed by the Debtor and the Committee seeking approval of a settlement pursuant to Fed. R. Bankr. P. 9019 ("the 9019 Motion"). The proponents of the 9019 Motion request approval of the settlement of a motion previously filed by Parents' Committee. The parties refer to that earlier motion of the Parents' Committee as "the Constructive Trust Motion."

In the Constructive Trust Motion, the Parents' Committee requested that this court impose a constructive trust in favor of the Comp-Ed Claimants on the funds titled in the Debtor's name and held in a certain bank account at Sovereign Bank ("the Sovereign Account"). There is approximately $1.4 million in the Sovereign Account. In essence, the Constructive Trust Motion put at issue whether a substantial asset should be devoted to the exclusive benefit of a sub-class of unsecured creditors or instead, should be part of the general bankruptcy estate and available

---

[1]  The parties refer to the parents holding such claims as "the Comp-Ed Claimants." At the May 21, 2007 hearing, one estimate was that there approximately 115 such Claimants.

[2]  I am not certain whether all or only some of the former board members are members of the Special Committee.

for distribution pro rata to all of the unsecured creditors (including the Comp-Ed Claimants).

Shortly before the hearing on the Constructive Trust Motion, the Parents' Committee, the Committee and the Debtor reached a settlement that they memorialized in the form of a Settlement Agreement ("the 9019 Settlement Agreement"). In the 9019 Motion, the Debtor and the Committee request court approval of the 9019 Settlement Agreement. While not a formal movant, the Parents' Committee is a party to the settlement and supports the 9019 Motion.

Four (4) parties in interest objected to approval of the settlement of the Constructive Trust Motion: (1) the Special Committee, (2) Mimi Rothschild, an individual who asserts that she is a Comp-Ed Claimant and who also asserts an interest in a corporate entity that holds a large, general, unsecured claim against the bankruptcy estate;[3] (3) Maria DeCarmine-Bender, an individual who asserts both prepetition and postpetition claims arising from services she has performed in connection with the claims of the Comp-Ed Claimants, (4) Carolyn Knapp, an individual who served as the assistant to Ms. DeCarmine-Bender and who asserts similar claims.

On May 21, 2007, I conducted a lengthy hearing on the 9019 Motion, in which all of the parties mentioned above participated. Also participating in the hearing were the U.S. Trustee and the Commonwealth of Pennsylvania, Department of Education ("the PDE").[4]

For the reasons set forth below, I will grant the 9019 Motion and approve the settlement of the Constructive Trust Motion.

---

[3] Unlike the other parties, Ms. Rothschild did not file a written response to the 9019 Motion. However, she appeared at the hearing on the Motion and was permitted to participate.

[4] The PDE is the original source of the monies that are in the Sovereign Account.

## II. <u>BACKGROUND</u>

### A. <u>The Debtor – Prepetition</u>

To understand the dispute regarding the 9019 Motion, it is helpful to review some of the history of the Debtor's prepetition operations.  In this recitation, to the extent that I refer to facts not contained in the evidentiary record made on May 21, 2007, I will limit myself to matters contained elsewhere in the record in this bankruptcy case[5] or facts that are not disputed by the parties.

On March 20, 2001, the Debtor received a charter from the Morrisville Borough School District ("the MBSD") to operate an online charter school.  It began operating that fall.  From the outset, the Debtor was embroiled in litigation with individual school districts,[6] and the PDE.  The litigation appears to have involved issues such as the Debtor's compliance with PDE and individual school district regulatory requirements, the adequacy of the services the Debtor provided to its students (in particular, students with special needs, referred to as special education students) and the adequacy of the PDE and individual school district funding provided to the Debtor.  The Special Committee and Objector Rothschild believe fervently that the Debtor's financial and legal problems were all, or at least primarily, attributable to what they consider

---

[5]  I may take judicial notice of the content of the documents filed in the case for the purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute.  <u>See</u> Fed. R. Evid. 201;  <u>In re Scholl</u>, 1998 WL 546607, at *1 n. 1 (Bankr. E.D. Pa., Aug. 26, 1998);  <u>See also</u> <u>In re Indian Palm Associates, Ltd</u>. 61 F.3d 197, 205 (3d Cir. 1995).

[6]  The Debtor had a relationship with multiple school districts because an on-line charter school, by its very nature, can draw students from multiple school districts. To resolve the issue before me, it is not necessary to examine more closely the state law funding mechanisms for an on-line charter school. It is sufficient to know that the funding process involved an interrelationship among the charter school, the individual school districts and the PDE

PDE's wrongful withholding of funds to which the Debtor was entitled.[7]

On March 28, 2002, the Debtor, the PDE and the MBSD entered into a settlement

agreement ("the PDE Settlement Agreement") that resolved a lawsuit the PDE had filed against

the Debtor and the MBSD. The PDE Settlement Agreement imposed a number of obligations on

the Debtor including:

- with the cooperation of the MBSD, the prompt amendment of the Debtor's charter, if necessary, to ensure the compliance with a number of requirements relating to school operations;

- within thirty (30) days, the development of an individual education plan ("IEP") for at least one-half of the students identified as in need of special education;

- within forty-five (45) days, the development of an IEP for all special education students;

- the development of procedures for parent complaints, resolution of billing disputes between the Debtor and individual school districts and the transfer of records by the Debtor to other schools;

- the auditing of invoices paid by the Debtor to its consultant, Tutorbots, Inc.;

- cooperation with any auditor or forensic accountant employed by the PDE to resolve the Debtor's outstanding "past due" claims.

For its part, in Paragraph 13 of the PDE Settlement Agreement, the PDE agreed to review

the Debtor's past due funding claims and, after verification for accuracy, pay those claims within

---

[7] The Special Committee goes so far as to allege that the public school system's hostility to "innovative approaches to education" caused the school districts to engage in a "coordinated strategy" to thwart the Debtor by withholding funding and student records needed for the Debtor's operations. Special Committee's Objection to 9019 Motion ¶11. I need not decide if the Special Committee's version of the factual history is correct. Undoubtedly, the interrelationship among the Debtor, the individual school districts and the PDE was contentious from the outset of the Debtor's operations.

ten (10) business days after execution of the agreement.[8]  The PDE's promise to pay set forth in

Paragraph 13 of the PDE Settlement Agreement was qualified further, however, in several ways

that are germane to the issue before me.

Paragraph 13.b. of the PDE Agreement provides:

> (2) **In order to provide a fund from which special education services might be provided**, [PDE] will withhold from past-due claims an amount determined as follows:
>
>> [(I) and (ii) set forth a formula].
>
> (3) [PDE] shall forward the amount determined in sub-paragraph (b)(2) of this paragraph to [the Debtor] **for immediate placement into an escrow account** overseen by the independent comptroller described in paragraphs 10 and 12.
>
> (4) [The Debtor] may obtain disbursement of the funds described in sub-paragraph (b)(3) **for fulfilling special education requirements and providing special education services** to those students who were enrolled in [the Debtor's school] during the 2001-2002 school year . . . **to fulfill the requirements of any student's IEP, or for providing compensatory education**.  The comptroller will disburse funds only upon express authorization by the Secretary [of PDE] or his designee.

(emphasis added).

Finally, the PDE Agreement contained an Addendum.  The Addendum set forth a

"payment schedule pursuant to paragraph 13."  The Addendum provided for a payment to the

Debtor of $3,373,865.62 within ten (10) days.  Of that amount, the Addendum authorized the

Debtor to use $2,373,865.62 for its operations.  The remaining $1,000,000.00 **"must be placed**

**in the escrow account described in paragraph 13(b)**," i.e., the special education/compensatory

---

[8]  Upon receipt of these funds, the Debtor agreed to the following payment priority: back wages and benefits owed to professional employees, internet service providers, vendors other than the Debtor's consultant (Tutorbots) whose services are essential to the school's operations.  PDE Agreement ¶14.

education escrow account.  PDE Settlement Agreement, Addendum ¶1 (emphasis added).[9]

There appears to be no dispute that after the execution of the PDE Settlement Agreement, the PDE released approximately $3.3 million in funds to the Debtor and the Debtor deposited $1 million into the Sovereign Account.

The PDE Settlement Agreement did not solve the Debtor's operational and financial problems.  The Debtor's charter was revoked on June 30, 2003, causing its educational operations to terminate.

## B.  Procedural History in the Chapter 11 Case

As stated above, this bankruptcy case was commenced on March 2, 2006.  Early in the case, the Debtor took the position that the Comp-Ed Claimants have an interest in the Sovereign Account.  See July 5, 2006 Hearing Transcript at 30 (Statement of Debtor's Counsel).

On October 16, 2006, the Debtor and the Committee filed a proposed Joint Liquidating Plan of Reorganization ("the Initial Proposed Plan").  In the Initial Proposed Plan, the funds in the Sovereign Account, in their entirety, were earmarked for payment of the Comp-Ed Claims.  See Initial Proposed Plan ¶¶3.4, 5.9.a.  However, on November 28, 2006, the Committee withdrew the Initial Proposed Plan.  At a status hearing held on December 6, 2006, the Committee's counsel advised the court that its withdrawal of the Initial Proposed Plan did not mean that the Committee had decided to oppose the earmarking of the Sovereign Account for the benefit of the Comp-Ed Claims, but that it was "keeping [its] options open."  (December 6, 2006

_____

[9]  The Addendum also obligated the Debtor to place additional payments received from the PDE in the escrow account until the escrow account reached $3,100,000.00 "by at least June 30, 2002."  PDE Agreement, Addendum ¶2.

Hearing Transcript at 4-5, Statement of Counsel for the Committee).

On February 15, 2007, most likely as a means to bring to closure the issue of the appropriate disposition of the Sovereign Account, the Parents' Committee filed the Constructive Trust Motion.  In that motion, the Parents' Committee asserted that the Comp-Ed Claimants have a legal entitlement to all funds in the Sovereign Account.[10]  The Committee and the Special Committee filed responses in opposition to the Constructive Trust Motion.  A hearing on the Constructive Trust Motion was scheduled for April 13, 2006.

Prior to the hearing on the Constructive Trust Motion, the parties engaged in settlement negotiations.  Additionally, at the parties' request, I appointed my colleague, the Honorable Jean K. FitzSimon, as Mediator.  On March 23, 2007, Judge FitzSimon conducted a mediation session which, I understand, lasted for almost full a day.  At the conclusion of the mediation on March 23, 2007, a settlement was not reached.  However, a few days before April 13, 2006, the Parents' Committee, the Debtor and the Committee reported a settlement and the hearing on the merits of the Constructive Trust Motion was canceled.

The 9019 Motion now before me was filed on April 18, 2007.  Simply put, the 9019 Settlement Agreement provides for:

> (1) the bankruptcy estate to receive $500,000 from the Sovereign Account;
>
> (2) the balance of the account (approximately $925,000) to be held in trust for the benefit of the Comp-Ed Claimants ("the Comp-Ed Fund");
>
> (3) the establishment of a voluntary, "opt-in," alternative dispute resolution

---

[10]    The filing of the Constructive Trust Motion represented a shift in the parties' approach in the administration of this case.  Prior to the Motion, the parties attempted to determine the disposition of the Sovereign Account through negotiation of a consensual liquidating chapter 11 plan, rather than litigation.

process for allowance of the individual Comp-Ed Claims payable from the Comp-Ed fund, subject to judicial review in the bankruptcy court;[11]

(4)    the retention of professional consultants by both the Parents' Committee and the Committee respectively to assist in the adjustment and allowance of the individual Comp-Ed Claims payable from the Comp-Ed fund;[12]

(5)    the payment of expenses arising from the administration of the Comp-Ed Fund from the Comp-Ed Fund and not from the general bankruptcy estate

(6)    for all Comp-Ed Claimants who choose to participate in the Comp-Ed Fund, the assignment to the bankruptcy estate of any claims they have against third parties of on account of the allegedly inadequate educational services provided to them or their children;

(7)    for all Comp-Ed Claimants who choose to participate in the Comp-Ed Fund, to release their claims against the bankruptcy estate, except as otherwise provided in the 9019 Settlement Agreement;

(8)    the reversion to the bankruptcy estate of any monies in the Comp-Ed Fund remaining if all allowed Comp-Ed Claimants who opt-in to be paid from the Comp-Ed Fund are paid in full;

(9)    if the Comp-Ed Fund is insufficient to pay the opt-in Comp-Ed claims in full, the allowance against the bankruptcy estate of Comp-Ed Deficiency Claims – provided, however, that such deficiency claims are payable on a pro rata basis with unpaid general unsecured claims only from additional monies collected by the estate from litigation for unpaid special or compensatory education funding.

As mentioned earlier, an evidentiary hearing was held on May 21, 2007.  Notice of the hearing was provided to all parties in interest.  See Docket Entry No. 349.

---

[11]    Comp-Ed Claimants who do not "opt-in" can have their claims administered in the general bankruptcy estate.

[12]    The Parents' Committee's consultant is to be paid from the Comp-Ed Fund.  The Committee's Consultant is to be paid from the general bankruptcy estate.

**C. The Economic Dynamics in this Case**

Finally, before discussing the merits of the 9019 Motion, I will summarize certain

financial realities in this case, as they are relevant in my consideration of the merits of the

motion.

Presently, there are 114 filed claims.[13]  In addition, the Debtor's filed Schedule F lists a

number of creditors holding claims that are not identified as contingent, unliquidated or disputed

and that therefore, are allowed, general unsecured claims.  See Fed. R. Bankr. P. 3003(b)(1).  I

have not cross-referenced the Claims Register against Schedule F, but the likelihood is that there

are more than 114 claims being asserted at this time.  Obviously, the claims have not been

reviewed by the interested parties and subjected to the claims objection process where

appropriate.  Nevertheless, it is helpful to know the order of magnitude of the estimated total

amount of allowed unsecured claims in this case.

The Committee estimates that the total amount of allowable general unsecured claims is

approximately $6 million. Since the claims docket presently includes approximately $3.8 million

in asserted unsecured priority claims and $7.35 million in asserted general unsecured claims, I

find the Committee's estimate reasonable for present purposes.  I understand this estimate to

exclude the Comp-Ed Claims.

None of the parties are comfortable estimating the aggregate amount of the Comp-Ed

Claims.  All parties seem to agree that there are inherent difficulties in liquidating the damages

suffered by a child with special needs who was denied a year of appropriate education.  Further,

---

[13]  Earlier, I stated that there are approximately 115 Comp-Ed Claimants.  The similarity
between the number of Comp-Ed Claimants and the number of claims in this case to date is a
coincidence.

-10-

the amount of harm may vary dramatically from child to child.  Testimony elicited at the May 21,

2007 hearing suggested that the average Comp-Ed Claim may turn out to be as low as $4,000 per

claim, but that the average could also end up being $10,000 per claim or even higher, particularly

if several very large claims are ultimately allowed.  Given the number of Comp-Ed Claimants,

the aggregate of the claims could be less than $500,000, but could also exceed $1 million,

perhaps substantially.

Presently, the bankruptcy estate consists of three assets: (1) approximately $750,000 in

the Debtor's bank account (Testimony of David Johns, May 21, 2007 hearing);[14] (2) the

Sovereign Account of approximately $1.4 million; and (3) potential claims against governmental

entities and the Debtor's prepetition consultant, Tutorbots, Inc.  The potential claims would

require litigation that has not been initiated.  The value, if any, of the potential claims is presently

unknown.

Significantly, there is no dispute among the parties that the PDE is the source of the funds

in the Sovereign Account.  Further, it is undisputed that the Sovereign Account was created to

carry out the escrow obligations imposed by ¶13.b.3 and Addendum ¶1 of the PDE Settlement

Agreement.

Finally, as of May 17, 2007, applications for compensation and reimbursement of

expenses pursuant to 11 U.S.C. §§330, 331 or 503(b)(4) have been filed by counsel for the

Debtor, the Committee and the Special Committee.  These three (3) applications total

---

[14]   I understand this to be the amount remaining in the Debtor-in-Possession account after payment of approximately $175,000 to a secured creditor in settlement of a disputed claim, as authorized by this court's Order dated December 27, 2006.

approximately $410,000.[15]   If the 9109 Motion is approved, the compensation allowed to these

three (3) professionals will be payable from the general bankruptcy estate.   In addition, the

Parents' Committee filed an application for compensation and reimbursement of expenses for the

same period, requesting an aggregate sum of approximately $30,000.  If the 9019 Motion is

approved, the Parents' Committee's counsel's compensation will be paid from the Comp-Ed

Fund, not the general bankruptcy estate.


## III.  DISCUSSION

### A.  Legal Standard

"To minimize litigation and expedite the administration of a bankruptcy estate,

'[c]ompromises are favored in bankruptcy.'" In re Martin, 91 F.3d 389, 393 (3d Cir. 1996)

(quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed.1993)).

Court approval of settlements that affect the bankruptcy estate are governed by Fed. R.

Bankr. P. 9019, which provides:

> (a) Compromise. On motion by the trustee and after notice
> and a hearing, the court may approve a compromise or
> settlement. Notice shall be given to creditors, the United
> States trustee, the debtor, and indenture trustees as provided
> in Rule 2002 and to any other entity as the court may direct.

In Martin, our Court of Appeals identified four (4) factors that a bankruptcy court should

---

[15]   For the period ending February 28, 2007, the Debtor's counsel has requested an allowance of compensation and reimbursement of expenses totaling approximately $143,000, the Committee's counsel has requested an allowance of compensation and reimbursement of expenses totaling approximately $220,000 and the Special Committee's counsel has requested an allowance of compensation and reimbursement of expenses totaling approximately $49,000.

consider in determining whether to approve a settlement pursuant to Fed. R. Bankr. P. 9109(a):

> (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.

91 F.3d at 393; accord, In re Nutraquest, Inc., 434 F.3d 639, 644 -645 (3d Cir. 2006) (holding that the Martin factors apply to settlement of both affirmative claims held by the estate and claims brought against the estate).

The Martin factors are designed to assist the court in reaching its ultimate decision – i.e., whether the settlement is "fair and equitable." Nutraquest, 434 F.3d at 644. Ordinarily, to find that a settlement is "fair and equitable, " the court must conclude that "the bankruptcy estate – i.e., the interest of creditors – is not adversely affected by the proposed settlement with a particular creditor or third party." Seitz v. Garman, Adv. No. 06-068, slip op. at 18-19 (Bankr. E.D. Pa. March 27, 2007) (per Fox, J.) (unreported memorandum).[16]  For an affirmative claim held by the estate, the court must be satisfied that the estate is receiving "fair compensation."  For a claim against the estate, the court must be satisfied that the settlement "does not involve [a] clear overpayment by the estate." Id. at 18.

Courts have articulated three other important principles applicable in a bankruptcy court's Rule 9019 determination whether a settlement should be approved.

First, ordinarily, it is not the court's role to substitute its judgment for that of the trustee. In re Neshaminy Office Bldg. Associates, 62 B.R. 798, 803 (E.D. Pa. 1986).  If the trustee's

---

[16]    In some cases, the determination whether a settlement is "fair and equitable" may require that the court take into account the fairness of the settlement to non-settling parties. Nutraquest, 434 F.3d at 645.

decision to settle a dispute has a legitimate business justification, that decision is entitled to considerable deference. See  Martin, 91 F.3d at 395; In re Jasmine, Ltd., 258 B.R. 119, 123 (D.N.J. 2000); see also Garman, slip op. at 17; In re Commercial Loan Corp., 316 B.R. 690, 703 (Bankr. N.D. Ill. 2004); In re Eastwind Group, Inc., 303 B.R. 743, 750-51 (Bankr. E.D. Pa. 2004).  This is not to say that the court must approve a settlement simply because the trustee so requests.  The court has the obligation to "carefully examine settlements before approving them." Nutraquest, 434 F.3d at 644.  However, so long as  the settlement does not "fall below the lowest point in the range of reasonableness," the court should defer to the judgment of the trustee. In re W.T. Grant & Co., 699 F.2d 599, 608 (2d Cir.), cert. denied, sub. nom. Cossoff v. Rodman, 464 U.S. 822, 96 S.Ct. 1236 (1983) (quoted in Neshaminy, 62 B.R. at 803); see also In re Vazquez, 325 B.R. 30, 36 (Bankr. S.D .Fla. 2005) ("The court is neither to 'rubber stamp' the trustee's proposals nor to substitute its judgment for the trustee's . . . .").

Second, notwithstanding the deference accorded the trustee's business judgment, the trustee still bears the burden of proving that the settlement is fair and equitable and therefore, should be approved.  See Eastwind Group, 303 B.R. at 750.  That burden is "to provide the court with sufficient information to [permit the court to] conclude that the compromise falls within the reasonable range of litigation possibilities."  In re Key3Media Group, 336 B.R. 87, 93 (Bankr. D. Del. 2005).  It is not, however, a burden to prove or negate the underlying claim.  See id.

Third, the process the court employs in evaluating the compromise is circumscribed.  As one court has explained:

> In its efforts to resolve the matter, "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing,

there would be no need of settlement." Nor is the court required to make a
determination that the settlement is the best possible compromise. In determining
whether to approve a settlement, "[t]he court is not supposed to have a 'mini-trial'
on the merits, but should 'canvass the issues to see whether the settlement falls
below the lowest point in the range of reasonableness.' "

Key3Media Group, 336 B.R. at 92 -93 (quoting In re Martin, 212 B.R. 316, 319 (8th Cir. B.A.P.

1997) and Jasmine, 258 B.R. at 123)) (other citations omitted).


**B.  The Proponents of the Settlement Have Met Their Burden of Proof Under *Martin***

The proponents of the 9019 Motion have met their burden of proof under Martin. They

have established that the uncertainties and risks involved in the constructive trust litigation

combined with the attendant costs of litigating the constructive trust issue provide an adequate

business justification for the compromise reached after their extensive, arms-length negotiations

with the Parents' Committee.[17]  The result achieved by the settlement  is well above the lowest

point in the range of reasonableness.  Further, after assessing the effect of the 9019 Settlement

Agreement on the creditor body as a whole, I am also satisfied that the settlement is in the best

interest of creditors.  Below, I further explain how I reached these conclusions.

Under Martin, my analysis begins with an assessment of the underlying litigation.  In this

case, the issue was whether the bankruptcy court should impose a constructive trust on the funds

in the Sovereign Account.

---

[17]  This statement encompasses Martin factors #1 and #3.  Martin factor #2 (collectibility)
is not applicable in a dispute such as this, involving a determination whether an asset is or is not
included in the bankruptcy estate.

**1.**

The legal principles regarding the imposition of a constructive trust under Pennsylvania

law  were well summarized recently in <u>In re Brockway Pressed Metals, Inc.</u>, 2007 WL 960047

(Bankr. W.D. Pa. March 30, 2007):[18]

> Under both Pennsylvania and federal law, a constructive trust is not a real trust but rather an equitable remedy utilized to avoid unjust enrichment.
>
> The Pennsylvania Supreme Court has stated "[a] constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it."  A constructive trust is actually a form of restitution and an equitable remedy imposed to avoid unjust enrichment. Specific intent to create a constructive trust is not required.
>
> . . .  A heavy burden lies with one who seeks to have a constructive trust imposed. The evidence must be clear, direct, precise and convincing.
>
> There are no rigid standards for the imposition of a constructive trust. Because constructive trusts find their root in equity, courts impose them where there is a finding that a party, against whom the trust is imposed, acquires property in a manner which creates an equitable duty in favor of the party seeking the constructive trust. Traditionally, constructive trusts have been imposed where a

---

[18]  I conclude that Pennsylvania law applies.  In <u>Columbia Gas Systems, Inc.</u>, 997 F.3d 1039, 1055-58 (3d Cir.), <u>cert. denied</u> 510 U.S. 1110, 114 S.Ct. 1050 (1993), the Third Circuit held that the determination whether the debtor held particular funds in trust was a question of federal common law. In that case, the debtor received the funds from its upstream supplier of natural gas for the specific purpose of providing refunds to the debtor's downstream customers. <u>Columbia Gas Systems</u> involved a debtor whose revenues were derived from operations in an industry subject to substantial federal regulation. Subsequently, most courts have read the decision narrowly to mean that federal common law applies only when a bankruptcy court evaluates the scope of a federally created statutory property right.  <u>See</u> <u>Brockway Pressed Metals</u>, at *17-18 & authorities cited therein.  As the <u>Columbia Gas Systems</u> court itself acknowledged, courts should follow state law, rather than developing rules of federal common law, "unless state law would undermine the objectives of the federal statutory scheme and there is a distinct need for nationwide standards." 997 F.2d at 1055.  As this case involves the entitlement to monies paid by the Commonwealth of Pennsylvania pursuant to Public School Code of 1949, 24 P.S. §§1-101 <u>et seq.</u>, it is especially appropriate for state law to provide the rule of decision.

party acquires legal title to property by violating some express or implied duty owed to another. Such a trust may also be imposed where property is obtained through bad faith, fraud, or lack of good conscience.

2007 WL 960047,  at *19-20 (citations omitted); see also In re Kulzer Roofing, Inc., 139 B.R. 132, 140 -141(Bankr. E.D. Pa.), aff'd, 150 B.R. 134 (E.D. Pa. 1992).


**2.**

In support of the Constructive Trust Motion, the Parents' Committee argued that the PDE monies were paid into the Sovereign Account for the sole benefit of the Comp-Ed Claimants and that use of the fund for any other purpose would constitute unjust enrichment.  This contention is rooted in the plain language of the PDE Settlement Agreement quoted above, particularly Paragraph 13.b.2 to b.4 and the Addendum thereto.  The Parents' Committee argued that the Debtor's role and relationship to the Sovereign Account was nothing more than a "conduit" as the funds were set aside for the exclusive benefit of the Comp-Ed Claimants.  In the end, the Parents' Committee's theory was that the PDE delivered the monies now held in the Sovereign Account to the Debtor for a singular purpose  -- – i.e., the provision of special education services. Consequently, the Parents' Committee contended that any use of those funds for satisfaction of the Debtor's general obligations would constitute unjust enrichment, justifying the imposition of a constructive trust.

The Committee presented a vigorous response to the Constructive Trust Motion.  The Committee contended: (1) the imposition of a constructive trust on property that would otherwise

be property of the bankruptcy estate under 11 U.S.C. §541 is disfavored;[19] (2) the PDE

Settlement Agreement was nothing more than a prepetition contract providing preferential

treatment to the Comp-Ed Claimants that cannot survive in bankruptcy because no such priority

exists in favor of the Comp-Ed Claimants under 11 U.S.C. §507; (3) after its creation, the

Sovereign account was not used strictly as an escrow account in conformity with the

requirements of the PDE Settlement Agreement; and (4) in any event, if no constructive trust

were imposed, no unjust enrichment would arise because the funds will not benefit the Debtor or

its principals but will be used to pay the Debtor's creditors.[20]

In opposition to the 9019 Motion, the Special Committee raises an objection to settlement

that, perhaps not surprisingly, overlaps certain arguments made earlier by the Committee in

opposition to the Construction Trust Motion.

The Special Committee's written objection to the 9019 Motion includes a lengthy

recitation of the events it claims culminated in the execution of the PDE Agreement.  Essentially,

these allegations are:

> (1) the PDE and the individual school districts improperly withheld funding due
> to the Debtor in 2002, which caused a severe cash flow crisis for the Debtor
> and compelled the Debtor to negotiate the PDE Settlement Agreement under
> duress;

> (2) at the conclusion of the negotiations,  the PDE Settlement Agreement was

---

[19]  See, e.g., In re Omegas Group, Inc., 16 F.3d 1443, 1452 (6th Cir. 1994) ("Constructive
trusts are anathema to the equities of bankruptcy"); In re Stotler and Co., 144 B.R. 385, 388
(1992) ("[A] constructive trust is fundamentally at odds with the general goals of the Bankruptcy
Code."); Kulzer Roofing, 139 B.R. at 139 ("we are not inclined to allow creditors to utilize a
trust theory as a means of obtaining preferential treatment in a bankruptcy") (quoting In re Temp-
Way Corp., 82 B.R. 747, 753 (Bankr. E.D. Pa. 1988)).

[20]  See Tri-State Mechanical Services, Inc., 141 B.R. 488, 493 (Bankr. W.D. Pa. 1992).

-18-

never approved by the Debtor's legitimate Board of Directors;

    (3)  the President of the Debtor's Board was either misled or coerced into signing the PDE Settlement Agreement by the law firm that purported to represent the Debtor at the time;

    (4)  the PDE Settlement Agreement itself imposed performance obligations on the Debtor (specifically, time deadlines for completing IEP's) that were unreasonable and impossible;

    (5)  during the relevant time period, the Secretary of the PDE had a conflict of interest that gave him a personal, financial incentive to impede the Debtor's operations, thereby tainting the entire relationship between the Debtor and the PDE.[21]

At the hearing on the 9019 Motion, Objector Rothschild articulated a similar argument.

As a consequence of these alleged events, the Special Committee and Ms. Rothschild believe that the bankruptcy estate presently includes substantial monetary claims against the PDE and individual school districts. More specifically, I understand them to contend that to the extent that the PDE Settlement Agreement purported to resolve the Debtor's outstanding claims, it should be treated as a nullity due to the irregularities accompanying its creation. Consequently, they posit that the top priority of the representatives of the bankruptcy estate should be initiating litigation against the PDE (and perhaps individual school districts) to collect from those parties the estates's substantial, outstanding monetary claims.

Based on these perceptions, the Special Committee and Ms. Rothschild argue that the

---

[21]  At the hearing on the 9019 Motion, with the consent of the proponents of the settlement, I accepted the Special Committee's offer of proof that its witness would testify in support of the provocative factual allegations made in its Objection to the 9109 Motion. By summarizing the allegations and accepting the offer of proof made at the hearing, I do not suggest that they have been proven to be true. As stated earlier, it is not the function of the court to decide the merits of the underlying dispute but only to evaluate the issues in the litigation so that the reasonableness of the decision to settle the matter can be evaluated.

9019 Settlement Agreement is not in the best interest of the bankruptcy estate.  They contend

that due to PDE's pervasive (and allegedly improper) underfunding of  the Debtor's first year of

operations, the sequestration of funds for the benefit of the special education students (allegedly

imposed by PDE) as a condition in the PDE Settlement Agreement merely served to reinforce the

Debtor's inability to meet its obligations to vendors and students other than special education

students.  The logic of this contention is that, compared to the special education students,  the

general unsecured creditors were equally, if not more, victimized by the improper conduct of the

PDE and the individual school districts.  Consequently, they argue that retention of the Sovereign

Account in the general bankruptcy estate would not constitute unjust enrichment and that the

concession made by the representative of the bankruptcy estate (i.e., the allocation of $925,000 to

the Comp-Ed Claimants, a sub-class of the Debtor's general unsecured creditors) is not

justifiable.[22]

---

[22]   The Special Committee and Ms. Rothschild  also argue that the settlement is
"premature."  Although they acknowledge that nothing in the 9019 Settlement Agreement
precludes the representative of the bankruptcy estate from pursuing monetary claims against the
PDE or the individual school districts, they express a concern that the Debtor, the Committee and
the professionals representing them will not attempt to augment the estate by asserting those
claims.  I flatly reject this argument.  The representatives of the estate and their professionals
have every financial incentive to pursue valid claims that would increase the distribution to
creditors in this case.  Also, of course, the Debtor and the Committee are fiduciaries with a duty,
in the exercise of their business judgment, to bring litigation to collect money owed to the estate.
See, e.g., In re Caldor, Inc., 193 B.R. 165 (Bankr. S.D.N.Y. 1996) (fiduciary obligation of
committee and its counsel); In re B. Cohen & Sons Caterers, Inc., 147 B.R. 369 (fiduciary
obligation of debtor-in-possession and its counsel).  I fail to see why the settlement of the
Constructive Trust Motion, which involves a dispute between different classes of unsecured
creditors over the allocation of a discrete fund, should cause the Debtor, the Committee or its
counsel to cease efforts to collect additional money due the estate from third parties. There is not
an iota of evidence to suggest that the Debtor, the Committee or their professionals will not carry
out their obligations in this case with fidelity.

**3.**

After juxtaposing and evaluating the positions of the parties, I am convinced that the professed uncertainty of the Debtor and the Committee as to their probability of defeating the Constructive Trust Motion is rooted in reality.  The decision whether to impose a constructive trust would have required a substantial amount of factfinding,[23] legal analysis, as well as the exercise of judicial discretion.  The fact, legal and mixed fact-law issues lurking in the constructive trust litigation include:

(1)  What are the precise mechanisms for funding a school such as the one the Debtor operated?

(2)  Are special education students afforded any unique or particular rights under applicable nonbankruptcy law?

(3)  Did the Debtor spend any of the money placed in the Sovereign Account and, if so, were the expenditures consistent with the purpose and made pursuant to the procedures set forth in the PDE Settlement Agreement?

(4)  With respect to other funds the Debtor received from the PDE and placed in its general operating account, how did the Debtor expend its money and for what purposes?

(5)  What weight, if any, should be given to the intent of the parties to the PDE Settlement Agreement to segregate public funds for the exclusive benefit of the special education students (i.e., the Comp-Ed Claimants).[24]

---

[23]  See In re Visiting Nurse Ass'n of Western Pennsylvania,143 B.R. 633, 637 (W.D. Pa.1992), aff'd, 986 F.2d 1410 (3d Cir. 1993) (Table).

[24]  Compare Tri-State Mechanical Service, Inc., 141 B.R at 493 (use of assets claimed by private party to be held in constructive trust is not unjust enrichment if non-imposition of constructive trust will result in payment to the general creditors) with In re Sacred Heart Hospital of Norristown 175 B.R. 543, 559 (Bankr. E.D. Pa.1994) (observing that there is some case law suggesting that standards for imposition of constructive trust standards may be less onerous when a governmental body or statutory scheme is involved, at least if the governmental unit is the creditor seeking the imposition of the constructive trust).

No party litigating the Constructive Trust Motion could have predicted, with any confidence, the outcome of the Motion.  Or, from a slightly different perspective, given uncertainties in this litigation, I cannot say that the decision of the representatives of the bankruptcy estate to allocate approximately $925,000 of the $1.4 million Sovereign Account to settle a claim against the entire fund represents a "clear overpayment"by the estate.  Garman, slip op. at 18.

Further, it was reasonable for the settling parties to take into account the delay in distribution inevitably resulting from further litigation.  Trial of the Constructive Trust Motion was scheduled to begin on April 13, 2007, but it was unclear how many days of trial were needed or exactly when the trial could have been completed.  Post-trial briefing and the time needed for the court to rule would have delayed case administration for some additional period of time.  The possibility of an appeal by the party losing control over a $1.4 million fund presented a potential for still further delay.  However, even absent an appeal and projecting a likely delay in distribution to creditors caused by litigating the constructive trust issue of measured in months (rather than years), I will not second-guess the decision of the creditors' representatives to compromise so as to expedite the distribution to creditors in this case –  case in which the creditors have been waiting for distribution for about four (4) years since the creation of the Sovereign Account.[25]

---

[25]   In situations in which resolution of a legal issue has been long delayed, there is a perennial dialectic between those who would say, "it has taken long enough; there can be no further delays" and those who respond by saying, "since it has taken this long already, a further delay of a few more months is not material."  There is no universal right answer in this debate. The approach to be taken in a particular case is a judgment call.  Because the proponents of the settlement have made a reasonable judgment call, I will defer to them.

Finally, settlement is in the paramount interests of the bankruptcy estate.  Presently, the

DIP account holds approximately $725,000.  Of that sum, perhaps as much as $410,000 has been

consumed already  in administrative expenses.  Considering the estimate that there may be $6

million in allowed, general unsecured claims, this case currently projects a distribution to

creditors of 5% or less if the Parents' Committee prevailed on the Constructive Trust Motion.

Acceptance of a guaranteed $500,000 from the Sovereign Account doubles the likely distribution

and cuts off the continued accumulation of administrative expenses in costly, risky litigation.

While accepting a guaranteed 35% of the fund in dispute may represent a cautious business

judgment, it is not below the lowest point in the range or reasonableness.[26]

For these reasons, I conclude that proponents of the 9019 Motion have easily met their

burden of providing the court with sufficient information to permit the conclusion that the

compromise is fair and equitable.

**C.   No Other Persuasive Objections to the Settlement Have Been Established**

Finally, the objections of Ms. DeCarmine-Bender and Ms. Knapp, who appear to voice

identical concerns, are without merit.

Ms. DeCarmine-Bender and Ms. Knapp couched their objections as an argument that the

settlement will undermine their ability to be paid for prepetition and postpetition services they

assert they have provided to the Comp-Ed Claimants.  However, they have not identified how

-----

[26]   This analysis does not even factor in the possibility that the bankruptcy estate can
increase as a result of the assignment to the estate of the claims against third parties held by the
Comp-Ed Claimants who opt-in to the Comp-Ed Fund or other litigation which may be brought
on behalf of the estate.  Of course, the value of this potential litigation is speculative at this time.

approval of the settlement will impair either their ability to receive a distribution for their

prepetition claim or to request the allowance of an administrative expense for the alleged post-

petition services rendered.  Indeed, they did not identify whether they believe their monetary

claims are payable from the general bankruptcy estate or the Comp-Ed Fund.  Their real concern

appears to be that if the 9019 Settlement is approved, they will not be retained in the future as the

Parents' Committee paid consultant to assist in the adjustment and allowance of Comp-Ed

Claims against the Comp-Ed Fund.  Their personal interest in being selected as the Parents'

Committee consultant is no basis for disapproval of the settlement.

Finally, in the course of their presentation, Ms. DeCarmine-Bender and Ms. Knapp also

suggested that the decision of the Parents' Committee to settle the Constructive Trust Motion

was tainted due to a lack of communication between the members of the Parents' Committee and

its constituency, the Comp-Ed Claimants. This issue was raised through cross-examination of the

chair of the Parents' Committee, Amy Stewart.[27]  However, in response to these questions, Ms.

Stewart detailed the nature of her personal communications with many members of her

constituency.  She also explained that until certain technical difficulties arose recently, the

Parents' Committee was in regular contact with the Comp-Ed Claimants via e-mail[28].  Further,

the Parents' Committee has arranged for its constituency to have access to all relevant court

filings through a link on its counsel's website.  In addition to these communications between the

---

[27]    The standing of Ms. DeCarmine-Bender and Ms. Knapp, who are not Comp-Ed
Claimants, to challenge the propriety of the decisionmaking process of the Parents' Committee is
suspect.  However, perhaps because the inquiry related to the integrity of the bankruptcy process
itself, neither any party nor the court objected to their inquiry during the hearing.

[28]    Ms. Stewart testified further that she is attempting to resolve the technical problems to
facilitate the Parents' Committee's future communications with its constituency.

Parents Committee and its constituency, each Comp-Ed Claimant was served with the 9019

Motion and notice of the hearing.

I find that the Parents' Committee has acted appropriately in its communication with the

Comp-Ed Claimants. Further, I find it significant that although every Comp-Ed Claimant was

served with the 9019 Motion and may also have received communications from Ms. Rothschild

designed to generate opposition to the 9019 Motion , not one Comp-Ed Claimant filed an

objection or appeared at the hearing in opposition to the 9019 Motion.[29]  The bottom line is that

---

[29]  It is true that Ms. Rothschild opposes the 9019 Motion and that she also asserts that she is a Comp-Ed Claimant. At the hearing, however, she conceded that because she also has a relationship with a corporation that has filed a substantial, general unsecured claim against the bankruptcy estate, she has a conflict of interest.  In any event, her opposition to the 9019 Motion was not based on the argument that it harmed the interests of the Comp-Ed Claimants.  Rather, her position was that the settlement was too generous to the Comp-Ed Claimants and therefore, not in the best interests of the bankruptcy estate.

If forced to choose where her ultimate allegiance lies, I suspect that Ms. Rothschild would side with the Comp-Ed Claimants, notwithstanding the logic of the position she took at the May 21, 2007 hearing.  However, she does not appear to believe that such a choice is necessary.  Instead, she appears to reject the possibility that the size of the bankruptcy estate may be limited and that the Comp-Ed Claimants may have to compete with other unsecured creditors to maximize their distribution from a "limited pie."

Ms. Rothschild seems to believe that if only the representatives of the bankruptcy estate would mount an all-out litigation attack on the PDE and perhaps the individual school districts, this bankruptcy case will generate enough money to provide a full, or at least very substantial, distribution to all creditors.  The Committee is less certain about these prospects.  Certainly, there is some justification for the Committee's skepticism.  Almost three (3) years passed between the demise of the Debtor's educational operations in 2003 and the filing of this bankruptcy case.  No one brought to my attention the existence of any significant litigation commenced  by the Debtor or by the Comp-Ed Claimants against the PDE or the individual school districts in that time period.  If either the Debtor or  the Comp-Ed Claimants held easily-provable, highly valuable monetary claims against multiple governmental entities for conduct occurring in or prior to 2003, it is reasonable to expect that some litigation would have been initiated before this bankruptcy case was filed in March 2006.  At a minimum, the absence of such litigation casts some doubt on the basis for Ms. Rothschild's optimism concerning the likely benefits of litigation.

although the Parents' Committee's decision to settle was not unanimous,[30] I see no problems

arising from the internal communications between the Parents' Committee and its constituency

that should bar the approval of the 9019 Motion.[31]

------

In the end, the real source of conflict between Ms. Rothschild and the official committees in this case is that the committees do not share her view that litigation will maximize the distribution to creditors in this case.  Ms. Rothschild fails to appreciate that litigation carries no guarantee of success and can easily render a bankruptcy estate administratively insolvent.  Ms. Rothschild may be knowledgeable in the field of special education and self-certain of the righteousness of her position, but she is only one individual participant in a large, collective legal proceeding.  While she has a right to be heard, that does not carry with it a requirement that her views be adopted by the fiduciaries in the case.

[30]   Ms. Stewart testified that the Parents' Committee voted 2-1 in favor of settling the Constructive Trust Motion.

[31]   Ms. DeCarmine-Bender and Ms. Knapp also seemed to labor under the impression that the Parents' Committee was obliged to conduct a formal poll of the Comp-Ed Claimants before agreeing to settlement terms resolving the Constructive Trust Motion.  I am aware of no such legal obligation with respect to the settlement of litigation by a bankruptcy committee appointed pursuant to 11 U.S.C. §1102(a).  Later in the bankruptcy process, the Comp-Ed Claimants will be entitled to vote on confirmation of the plan.

## IV.  **CONCLUSION**

In this Memorandum, I have attempted to set forth in detail the reasons for my decision in this matter because the parties are at a significant juncture in this case and the objectors, in good faith, are passionate in their opposition to the settlement.  However, the decision is not a close call.  The Debtor and the Committee acted well within the discretion they are accorded in the bankruptcy process and the 9019 Settlement Agreement is fair and equitable.

An order consistent with this Memorandum will be entered.

Date:   **May 31, 2007**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

-27-

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re  **THE NATIONAL ORGANIZATION**    :     **Chapter 11**
       **FOR CHILDREN**                :
               **Debtor**      :
                              :     **Bankruptcy No.  06-10777ELF**
                              :

# O R D E R

    **AND NOW,** upon consideration of Joint Motion of The Debtor and The Official

Committee of Unsecured Creditors For an Order Approving A Stipulation and Agreement

Settling the Motion of Parents' Compensatory Education Funds Committee For An Order

Imposing Constructive Trust (Docket Entry No. 339) ("the 9019 Motion"), the responses thereto,

and after a hearing, and for the reasons set forth in the accompanying Memorandum, it is hereby

**ORDERED** that:

1. The 9019 Motion is **GRANTED**.

2. All objections to the 9019 Motion are **OVERRULED**.

3. The Stipulation and Agreement settling the Motion of the Parents' Compensatory Education

   Funds Committee For An Order Imposing Constructive Trust ("the Stipulation") is

   **APPROVED**.

4. The parties to the Stipulation are authorized to carry out the terms of the Stipulation.

Date:  **May 31, 2007**            _____
                                    **ERIC L. FRANK**
                                    **U.S. BANKRUPTCY JUDGE**

**<u>Counsel</u>**
Albert Ciardi III
Shannon Leight
Attorneys for the Debtor

Michael A. Reed
Thomas A. Spratt, Jr.
Attorneys for the Official Committee of Unsecured Creditors

Jeffrey Kurtzman
Attorney for the Parents' Compensatory Education Funds Committee

Michael W. Jones
Attorney for the Unofficial Special Committee

Marnie E. Simon
Attorney for the Commonwealth of Pennsylvania, Department of Eduation

Frederic J. Baker
Attorney for the U.S. Trustee

cc: Mimi Rothschild
    Maria DeCarmine-Bender
    Carolyn Knapp